CHIEF JUSTICE LINDSAY
delivered the opinion oe the court.
The Commonwealth instituted this action against various defendants, and complains, among other things, that Simmons & Dickinson claim the right to use and enjoy certain privileges, and to draw certain classes of a scheme or schemes devised, or purporting to have been devised, under the grant of a lottery privilege to Edward H. Taylor and others, as managers, for the benefit of the city schools, and for the construction of the water-works, reservoirs, etc., of the city of Frankfort, and that said defendants are yearly, and possibly much oftener, selling chances and tickets in drawings, and otherwise exercising the extraordinary privileges conferred by *187 said grant. It avers that they have no right or title thereto, and that no legal claim now exists in them, or any one else, to use and enjoy said privileges; and it prays that they be prohibited from exercising them in the future.
"Without objecting to the jurisdiction of the court, or to the form of the action, and without attempting to take advantage of a supposed defect of parties, Simmons & Dickinson filed their joint answer, and exhibited the foundation of their claim, and asked to be dismissed.
The Commonwealth demurred to their answer1, but its demurrer was overruled.
The Board of Councilmen of the city of Frankfort, and the trustees of the city schools, who were defendants, asked the court to compel the plaintiff to elect which one of several actions pending in the same court it would prosecute. This motion was overruled.
They then demurred to the petition on the three several grounds: 1. Want of jurisdiction in the court; 2. Defect of parties, in not making the managers of the lottery defendants; and 3. That the facts stated do not constitute a cause of action as to them.
The first and third grounds of demurrer were adjudged unavailing, but the special demurrer for the defect of parties was sustained.
The court was then asked to require the plaintiff to elect whether it would prosecute the action against the board of trustees and board of councilmen and Simmons & Dickinson, or against them and one Stewart, who, it was alleged, also claimed some interest in the grant in question. This motion was also overruled. After answers were filed by the two boards and by Stewart, in all of which the alleged defect of parties was pleaded in abatement, the court required the Commonwealth to make the managers parties defendant. It declined to do so, and thereupon its petition was dismissed.
*188 So far as the beneficiaries in the grant, the board of councilmen and the board of school trustees, are concerned, this ruling was correct. The object of the Commonwealth is two-fold: 1. To prohibit the individuals who claim to own privileges and rights, as purchasers from the managers of the lottery, from the further exercise of such alleged' rights; and 2. To cancel the contracts between these parties and the managers, and to adjudge that the grant has been wholly exhausted.
The court could not assume to cancel those contracts, nor to dissolve the quasi corporation without having before it the trustees or holders of the legal title, as well as the cestuis que trust.
But the action might have been dismissed as to these boards without at all affecting the right of the Commonwealth to proceed as against Simmons & Dickinson and Stewart. They have not objected to being joined as defendants, and they have no right to demand that the parties through whom they claim shall be made parties to this proceeding.
Section 529 of the Civil Code of Practice provides that “ in lieu of writs of scire facias and quo warranto, or of an information in the nature of a quo warranto, actions by ordinary proceedings may be brought to vacate or repeal charters, and to prevent the usurpation of an office or franchise.”
The right of the attorney-general to institute an action under this section for the usurpation of a franchise, not confined in its effects to a particular county, is established by the 534th section of the Code, and does not depend at all on the resolution passed by the legislature and approved by the governor March 9, 1876.
The essential questions to be determined are, whether the petition presents a cause of action, and whether the demurrer of the Commonwealth to the answer of Simmons <fc Dickinson should have been overruled.
As we have already seen, the Commonwealth avers that *189 Simmons & Dickinson claim the right to use and enjoy the privilege of drawing certain lottery classes and of selling lottery tickets, and of doing such acts as amount in law to setting up, managing, and operating a lottery; that they are actually exercising these alleged rights, and that they have no legal authority so to do.
The privileges claimed and exercised by them are in the nature of a franchise. By the common law a franchise was said to be a branch of the king’s prerogative in the hands of a subj ect. (2 Sharswood’s Blackstone’s Com. 37.) In America it is understood to be a particular privilege conferred by grant from government and vested in individuals. (3 Kent’s Com. 458; Bouvier’s Law Dictionary, 611.) It is thus defined by Spencer, justice, in the case of the People v. Utica Ins. Co. (15 Johnson’s Reports, page 387), “ If there are certain immunities and privileges in which the public have an interest, as contradistinguished from private rights, and which can not be exercised without authority derived from the sovereign power, it would :Seem to me that such immunities and privileges must be franchises.”
The rights, privileges, and immunities alleged to be claimed and exercised by these defendants fall within these various definitions, and if they are usurping them, and the Commonwealth alleges they are, then under the averments of the petition it is the duty of the circuit court to render such judgment as will prevent such usurpation in the future.
But it is insisted in argument that as the ordinary action contemplated by section 529 of the Civil Code is but the substitute for the common-law remedy of information in the nature of a quo warranto, that therefore it can not be maintained unless the court would have permitted such a proceeding to be instituted before the adoption of the Code, and that an information would not lie at the common law to prevent the usurpation of .a private franchise. The last proposition is incorrect. This *190 question was considered in the case of the Commonwealth v. Arreson and others (15 Sergeant & Rawle, 130), and, after a review of many English cases, Judge Tilghman reached the conclusion that “ In all cases where a charter exists, and a question arises concerning an office claimed under that charter, the court may, in its discretion, grant leave to file an information, because in all such cases, although it can not be strictly said that any prerogative or franchise of the Commonwealth has been usurped, yet, what is much the same thing, the privilege granted by the Commonwealth has been abused. The party against whom the information is prayed has no claim but from the grant of the Commonwealth, and an unfounded claim is a usurpation under pretense of a charter of a right never granted.” And on the authority of this and other American cases, Angelí & Ames, in their work on Corporations (section 736), hold to the doctrine that the information was gra'ntable to inquire into and prevent the usurpation of the offices and franchises of private as well as of public corporations; and this doctrine was recognized by this court in the cases of Chambers v. The Baptist Educational Society (1 B. Monroe, 215) and the Commonwealth v. Lex. & Harrodsburg Turnpike Co. (6 B. Mon. 397). If the rule was different, abuses of this character would often occur for which there would be no adequate remedy, and the want of other adequate remedy has in some cases been deemed a sufficient reason for granting an information. (Angell & Ames on Corporations, sec. 740; Cas. K. B. 225; Buller’s N. P. 212.)
Hence we conclude the right of the attorney-general to institute the áction, and the necessity for the defendants Stewart and Simmons & Dickinson to plead to the petition can not be denied. The facts averred as to Stewart are substantially the same with those alleged against Simmons & Dickinson, and if he fails to plead to the merits of the action judgment should be rendered against him by default.
*191 Simmons & Dickinson show by their answer that in 1841 the managers of the lottery sold and transferred to one Gregory a scheme and certain classes devised by them, and that in 1861 they sold another scheme and the classes thereof to Wood, Eddy & Murray; and they aver that they are the assignees and owners of all the undrawn classes of the schemes so sold to Gregory and to Wood, Eddy & Murray. The documentary evidence filed by these defendants seems to sustain the allegations as to their ownership. But whether, according to their own statements, their asserted right to draw two hundred and eighty-eight undrawn classes has any legal existence must depend on the true construction of the lottery grant, and the conclusions to be deduced from certain facts not only admitted, but set up and relied on by them as constituting a defense to the action.
The act of February 1,1838 (Sess. Acts 1837-38, page 126), provided that it should be lawful for Taylor, Swigert, and their associates and successors, “to raise by way of lottery, in one or more classes as to them may seem expedient, any sum not exceeding one hundred thousand dollars,” to be appropriated for the use and benefit of the city schools, and for the construction of water-works for the city of Frankfort.
They were authorized to appoint clerks and other officers, and to superintend and control the drawings, and were not allowed to retain out of the proceeds of the sales of tickets more than twenty per cent. They were also authorized, by the 4th section of the act, to sell and dispose of the scheme, or any class or classes of said lottery, to any person or persons who should enter into bonds, etc., with the limitation that such sale or sales should not be made of any class or classes for less than ten per cent of the amount proposed to be drawn. This 4th section was afterward repealed, and in lieu thereof it was provided that the managers might sell and dispose of the scheme, or any class or classes, upon the purchaser executing *192 bond; and no such limitation was imposed on their power to sell, or that they should exact from the purchaser at least ten per cent of the amount proposed to be drawn. (Session Acts 1838 and 1839, p. 191.) It is evident the purchasers of the schemes and classes devised under this grant took no greater rights, and can enjoy no greater immunities and privileges, than were taken and could be enjoyed by the grantees themselves. They were empowered to raise, by way of lottery, “ any sum not exceeding $100,000.” If they had declined to sell, and had chosen to exercise the granted privilege of conducting and managing the drawings themselves, so soon as the net profits reached the sum of $100,000 the grant, by its own terms, would have been completely exhausted, no matter what number of the classes originally devised and agreed on might have remained undrawn. The authority of the managers to sell was fettered and restricted with this same limitation. By the act of 1839 they were empowered “to sell and dispose of the scheme, or any class or classes of the lottery referred to in said act” of 1838. This lottery was the lottery under which drawings might be had until the sum of $100,000 should be raised.
The persons, to whom the managers sold, acquired the right to raise that sum, and nothing more; and the question now is, not how many of the classes agreed on remain undrawn,- but what sum of money in the way of actual net profits has been raised by the drawings held before the institution of this action ?
On this material subject Simmons & Dickinson make no disclosure.
Whether, under .ordinary circumstances, they would be required to show that the grant or charter under which they claim had not expired or been exhausted, we will not now decide. The circumstances of this case are altogether extraordinary. The lottery grant was more than thirty-five years old when this proceeding was commenced. The legislature *193 evidently contemplated it should be made available for the purposes of the act within a reasonable period of time. It is not to be supposed the intention was that a business or avocation which the law-making department had theretofore denounced as injurious to the good citizens of the commonwealth, and productive of extensive evils (Act of 1816, vol. 2, p. 1150, Stat. Laws) should be carried on for an indefinite time, for the benefit, in the main, of the private person or persons to whom the rights, privileges, and immunities incident to the grant might be sold.
These appellees show by their answer that in the sale to Gregory the managers agreed to accept an annual bonus or royalty of $1,200, and no provision was made for any account to be kept from which they or the Commonwealth could ascertain the profits realized by their vendee. They evidently acted in this sale on the mistaken assumption that they had the right to secure for the schools and water-works of Frankfort the full sum of one hundred thousand dollars, and in doing so to empower their vendee to draw any named number of ■classes and to “raise by lottery” an unlimited sum of money.
Appellees also make it appear that the representatives of the city of Frankfort have long since received from them, and the persons through whom they claim, one hundred thousand dollars or its equivalent.
The lottery has been in active operation since 1840, and since the 22d of May, 1861, there have been drawn 7,898 classes, in each of which the appellees had the right or claimed to have the right, under their contracts, to award and pay prizes varying in amounts from twenty-five cents to one hundred thousand dollars.
The unauthorized and mistaken construction of the grants under which the sales were made by the managers; the great length of time the lottery has been in active operation; and the large sums of money paid over by the purchasers, immediate *194 and remote, authorize the presumption that the full sum of one hundred thousand dollars has been long since realized by the numerous drawings admitted to have been held. The facts necessary to rebut this presumption are peculiarly within the knowledge of the parties who have been exercising the lottery franchise, and they are necessarily out of the reach of the Commonwealth.
For these reasons it is incumbent on these appellees to rebut this presumption, and to show that for sufficient legal reasons the grant has not yet been exhausted, and if they fail to do so they will be prohibited from the further exercise of a privilege which tends to foster and encourage the spirit of gaming, is productive of injury to the people of the commonwealth, and is against common right.
The demurrer of the Commonwealth should have been sustained.
The provisions of the charter of the city of Frankfort, approved March 16, 1869, relating to or in which reference is made to the lottery grant under consideration, can not affect the law of this case, and hence the legal effect of these provisions has not been considered.
The judgment of the circuit court dismissing the petition as to Simmons & Dickinson and as to E. S. Stewart is reversed. As to each and all of the other appellees it is affirmed. The cause is remanded for further proper proceedings.